## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**JULIE COLLINS,**

     **Plaintiff,**

**vs.**                                   **CASE NO. 4:06cv10-RH/WCS**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D).  It is recommended that the decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

Plaintiff, Julie Collins, applied for disability insurance benefits.  Her last insured date was December 31, 2001, and thus she must show disability commencing before that date.  Plaintiff was 38 years old on June 15, 2004, at the time of the administrative hearing, had a 12th grade education, has training as a certified nurse aid, and has past

relevant work as a heavy equipment operator.  She was injured when boxes fell on her at a store.  Plaintiff alleges disability due to cervical disk injury and pain, and bipolar disorder.  The Administrative Law Judge found that including Plaintiff's "narcotic pain medication dependency," Plaintiff was disabled.  R. 28.  He also determined, however, that if she were to abstain from narcotic pain medications, she would have the residual functional capacity to perform light work, with limitations.[1]  With testimony from a vocational expert, the ALJ determined that Plaintiff could work as an office helper, mail clerk, and photocopy machine operator, and thus was not disabled as defined by Social Security law.  R. 29-30.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted); <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must

---

[1] The limitations were to "avoid more than frequent bending, stooping, crouching, crawling, kneeling or climbing and to have no more than occasional looking up or down with her neck and she would have been restricted to the performance of simple repetitive tasks in a non-production type work setting and not be required to have more than occasional interaction with co-workers, supervisors or the general public."  R. 29.

affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Record Evidence**

   **Testimony**

The administrative hearing was on June 15, 2004.  R. 36.  Plaintiff testified that on July 8, 2000, she was struck in the neck by "objects in a store," and had to have plates put in her neck.  R. 42-43.  She claimed that date as the onset of her disability.

*Id.* She said that she went to physical therapy for about two months after the surgery. R. 46, 49.

When questioned about her abuse of narcotic pain medications, Plaintiff initially denied that she had any problems with drug misuse. R. 48. She then said she had a lot of pain. *Id.* She later said that she was in pain, and admitted that she had taken more medication that she was supposed to have taken. R. 55.

### Physical Health Evidence

As early as 1996, Plaintiff was diagnosed as having migraine headaches. R. 318. She had had these headaches since age 15 and had them daily. R. 315. By 1998, she was taking Lorcet[2] for these headaches. R. 300. She was diagnosed with chronic headaches and obsessive compulsive disorder on November 23, 1998. R. 298. On February 2, 1999, the treating physician, Dr. J. Carter, determined that she was dependent on Lorcet, and had difficulties getting her to stop taking that medication. R. 294. Dr. Carter said he wanted to persuade Plaintiff to "get in to counseling." *Id.* Plaintiff complied, and was having withdrawal symptoms by March 3, 1999. R. 293. Plaintiff then tried to stop using Darvocet,[3] but by April 13, 1999, again had withdrawal

---

[2] Lorcet is hydrocodone bitartrate. PHYSICIANS' DESK REFERENCE (2004), p. 1306 , available from WestLaw. Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:

http://www.mercksource.com/pp/us/cns/cns_hl_dorlands.jspzQzpgzEzzSzppdocszSzus zSzcommonzSzdorlandszSzdorlandzSzdmd_a-b_00zPzhtm. .

[3] Darvocet-N 50 or 100 contains propoxyphene hydrochloride, a mild narcotic analgesic related to methadone. PHYSICIANS' DESK REFERENCE (2005).

symptoms and her headaches continued daily.  R. 291.  She was still exhibiting

obsessive compulsive behavior.  *Id.*

On June 20, 1999, Plaintiff suffered a second degree burn on her foot, and

Summer Knight, M.D., prescribed Percocet.[4]  R. 289.  On October 11, 1999, Plaintiff

saw Dr. Knight, seeking Darvocet for migraine headaches.  R. 284.  Dr. Knight refused

to prescribe Darvocet, and wrote that Plaintiff had to stop using addictive medications.

*Id.*  Plaintiff related a history to Dr. Knight of having been raped and held in a closet at

gunpoint for two weeks.  *Id.*  Dr. Knight prescribed Darvocet, with no refills, to be used

only twice a day until the prescription ran out.  *Id.*  On October 15, 1999, Plaintiff and

her husband were abusive toward Dr. Knight concerning the medications Dr. Knight had

prescribed (for mastitis) and Dr. Knight severed the relationship.  R. 280-282.

Plaintiff was treated by Gery K. Florek, M.D., from January 3, 2000, to July 9,

2001, for headaches and back pain.  R. 179-188.  On January 3, 2000, she said she

had had headaches with blurred vision and occasional vomiting since she was about 16

years old.  R. 188.  She said that she had them two or three times a month, each lasting

four days, or 18 days of headaches per month.  *Id.*  Dr. Florek noted that she overused

analgesics.  *Id.*  Plaintiff reported that she had tried Imitrex, Zomig, Maxalt, Inderal,

Amitriptyline, Prozac, Effexor, and Paxil, and these either were ineffective or had

adverse side effects.  R. 189.

---

[4] Percocet contains oxycodone and acetaminophen.  Oxycodone is an opioid similar
morphine, and also similar to codeine and methadone.  Physicians' Desk Reference
(2005).

On March 13, 2000, Plaintiff was seen by Stephen Meyer, M.D., for a migraine

headache.  R. 278.  She told Dr. Meyer that she was a "problem" or a "troubled" patient,

with bipolar disorder, chronic back pain, and cluster migraine headaches.  *Id.*  She

admitted to chronically taking Darvocet, Lorcet, and Percocet for pain.  *Id.*  She said she

also sometimes received Valium[5] from Dr. Platt for her bipolar disorder.  *Id.*  She had

also been taking Lithium, but had recently stopped on her own.  *Id.*  She said the

Lithium had left her lethargic and dehydrated.  *Id.*  She said the headache was not as

bad as they got, but she felt that she needed to be clear-headed to drive her son home.

*Id.*  Dr. Meyer's assessment was a migraine headache.  *Id.*  Dr. Meyer prescribed

Toradol[6] and Amerge,[7] and said she should be limited to 30 to 60 opioid pills per month.

*Id.*  Dr. Meyer said he would really prefer that Plaintiff use Lithium, and counseled her

on the proper use of opioid pain medication.  *Id.*  He prescribed 30 Darvocet and 30

Lorcet, or 60 Percocet.  *Id.*

On April 3, 2000, Plaintiff again saw Dr. Meyer, admitting that she used up to 120

opioid pain pills a month.  R. 277.  He said he would continue her on 60, but would taper

---

[5] Valium (diazepam) is a benzodiazepine derivative prescribed for the management of anxiety disorder and the short-term relief of the symptoms of anxiety.  It is also prescribed as adjunct relief for  skeletal muscle spasm.  Physicians' Desk Reference (2005).

[6] Toradol is a nonsteroidal anti-inflammatory (NSAID) drug.  It is "indicated for short-term (up to 5 days in adults) management of moderately severe acute pain that requires analgesia at the opioid level.  It is NOT indicated for minor or chronic painful conditions."  PHYSICIANS' DESK REFERENCE (2005).

[7] Amerge contains naratriptan hydrochloride prescribed for acute treatment of migraine headaches.  PHYSICIANS' DESK REFERENCE (2005).

this down in the "near future."  *Id.*  Apparently Plaintiff ended up with 60 Percocet from the last month.  *Id.*

On July 8, 2000, Plaintiff suffered a neck injury when merchandise fell on her at a Target store.  R. 42, 269.  X-rays revealed a fracture of her cervical spine.  R. 267.  Plaintiff was treated by C. S. Rumana, M.D., for her neck injury.  R. 153.  Dr. Rumana described the injury as involving a "tremendous cervical radiculopathy" and "a large C6-7 herniated disc on the right consistent with her pain."  *Id.*  On July 16, 2000, she had a C6-7 anterior cervical discectomy, fusion, and instrumentation.  *Id.*  She was discharged the next day with the note that she had had "dramatic pain relief of her right arm pain."  *Id.*  She was having "some mild neck pain."  *Id.*  She was discharged with a prescription for Vicodin[8] and a Medrol[9] Dosepak.  *Id.*

On July 19, 2000, Plaintiff called to report severe pain, including headaches, and right shoulder and hand pain.  R. 214.  She wanted a refill of the Vicodin prescription.  *Id.*  On July 20, 2000, Dr. Rumana noted that Plaintiff complained of a lot of pain (as reported provided to him by her husband), and she needed medications.  R. 213.  Dr. Rumana noted that many family members had cautioned him about giving her narcotics because she had a problem with narcotics, and Dr. Stephen Meyer confirmed her problem with narcotics.  *Id.*  Dr. Meyer said he was trying to slowly wean Plaintiff from use of narcotic analgesics, and Dr. Rumana said he would do likewise, though he

---

[8] Medrol is a brand name for Hydrocodone.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[9] Methylprednisolone, a derivative of prednisolone, which is used as an anti-inflammatory agent.  PHYSICIANS' DESK REFERENCE (2005).

prescribed Vicodin.  R. 213.  Dr. Rumana said that Plaintiff "may well have pain as a result of a low-pain threshold and the fact that she is taking so many narcotics means that she may be getting a decreased amount of relief with them."  *Id.*

Dr. Rumana saw Plaintiff again on August 1, 2000.  R. 211.  He thought that a "large amount" of her radicular pain had improved, but Plaintiff began crying several times in the office.  *Id.*  X-rays showed the bony fusion and plate to be "in excellent position," and he thought Plaintiff was doing "reasonably well" as she reported to him. *Id.*  On September 5, 2000, Plaintiff was doing "very well."  R. 210.  She had no further neck pain or arm pain.  *Id.*  He planned to set her up with physical therapy.  *Id.*

On August 3, 2000, Dr. Meyer said that Plaintiff was working with Dr. Donna Gillette in counseling to try to control her abuse of pain medications.  R. 265.  On August 25, 2000, she saw Dr. Meyer and was suffering withdrawal symptoms, having stopped taking pain medications four days earlier.  R. 264.  Dr. Meyer said that he and Dr. Rumana had agreed that only Dr. Meyer would write pain medications for her.  *Id.* She said that following her neck operation (to be discussed immediately ahead) she was having less neck pain on the right but more on the left.  *Id.*  She was still working with Donna Gillette, Ph.D., to try to stop using so much pain medication.  *Id.*  She said she was having panic attacks from the pain in her foot, tooth, and neck.  *Id.*  She had a dental infection that could not be treated until she had been released by her surgeon, Dr. Rumana.  *Id.*

By September 1, 2000, Dr. Meyer had reduced the pain medication to 40 per month, with the plan to go to 30 the next month.  R. 262.  On September 15, 2000, Dr. Meyer said that he believed that in July and August, Plaintiff had become physically and

mentally addicted to pain medications.  R. 261.  Dr. Meyer said that he and Dr. Rumana

felt that Plaintiff's need for pain medication was more psychological than physical.  *Id*.

The fracture had been repaired.  *Id*.  Dr. Meyer determined that he no longer could care

for Plaintiff, and said she needed addiction therapy.  *Id*.  Plaintiff "emphatically" refused

to go into detox.  *Id*.  After further consultations, she agreed to be admitted to detox.  *Id*.

On September 28, 2000, Dr. Rumana noted that Plaintiff's right arm pain was

gone, but she had begun to experience left arm pain.  R. 207.   Dr. Rumana said that

Dr. Meyer was concerned about the number of medications she was taking, that she

had reported to Apalachee Mental Health Center for detox, he (Dr. Meyer) was no

longer willing to treat her, and she was seeing Dr. Andrea Randall.  *Id*.  The motor

examination was essentially normal.  *Id*.  Dr. Rumana assigned a 15% whole body

impairment "based on her right cervical radiculopathy from C6-7 herniated disc."  R.

208.

On October 17, 2000, Dr. Rumana reviewed an MRI scan and determined that

there was "no evidence of disc herniation or nerve root compression" and "nothing

towards the left-side nerve roots."  R. 205.  He said that an EMG nerve condition

velocity study was also normal.  *Id*.  He recommended physical therapy, but Plaintiff had

not yet started.  R. 206.  Dr. Rumana prescribed Ultram[10] but said he would not give

Plaintiff any further pain medications.  *Id*.  He released her from his care.  *Id*.

Plaintiff was prescribed more Ultram from Dr. Randall on October 26, 2000.  R.

204.  She returned seeking more Ultram on October 30, 2000.  R. 203.

---

[10] Ultram (tramadol hydrochloride tablets) is a centrally acting synthetic opioid
analgesic.  Physicians' Desk Reference (2005).

On November 7, 2000, Plaintiff was seen by D. J. Underwood, M.D.  R. 257.  He noted that she had been in a detoxification program in September, and had been switched to Ultram for pain relief.  *Id.*  He noted that she had not gone to prescribed physical therapy because she could not drive.  *Id.*  She was caring for a two year old.  *Id.*  It was also noted that she was being treated for manic depression by Dr. Platt and was taking Lithium.  R. 256.  Dr. Underwood advised Plaintiff that he would treat her pain with non-steroidal medications, but she would have to attend physical therapy, avoid narcotics, and he was concerned about long-term use of Ultram.  *Id.*

On November 13, 2000, Dr. Rumana summarized his treatment of Plaintiff.  R. 201.  He noted that she now was having left arm pain.  *Id.*  He said that she would "likely require significant future care and treatment" because she "continues to have a variety of other problems," and he though "she possibly will need to see a psychiatrist in the future to help her with the emotional aspects of her injury."  R. 201-202.  He also thought she would need to see a pain management physician.  R. 202.  He did not think she needed any further neurosurgical care.  *Id.*

Plaintiff was seen by Ray Bellamy, M.D., on November 27, 2000.  R. 256.  She told Dr. Bellamy that she "liked to drive around in the woods with her young son on her 4-wheeler, garden and cook."  *Id.*  Upon examination, Dr. Bellamy thought Plaintiff was healthy and sincere, and not in any pain.  *Id.*  He concluded that he did not "find anything seriously wrong with her at this point" and encouraged her to get on with her life.  *Id.*

By December 28, 2000, Plaintiff was attending physical therapy once weekly.  R. 253.  On February 5, 2001, she reported to Dr. Underwood that she had completed

physical therapy and said she had an exacerbation of neck pain.  R. 250.  Dr. Platt had

switched her to Neurontin[11] for her bipolar disorder.  *Id.*  She had not gone to the pain

clinic because the clinic did not prescribe pain medication.  *Id.*

Plaintiff saw Dr. Florek on April 3, 2001, about six months after she left Dr.

Rumana's care.  R. 186.  She complained of left scapular pain radiating down her left

upper extremity.  *Id.*  She said that her migraine headaches had gotten better since the

neck surgery.  *Id.*  She was then taking Ultram and Neurontin.  *Id.*  Examination

revealed pain in the left upper extremity.  R. 187.  Nerve conduction studies of the left

side, however, were found to be normal a few days later, though an "upper motor

neuron type pattern" was suggested.  R. 185.

On April 19, 2001, it was Dr. Forek's assessment that Plaintiff had "persistent left

upper extremity radicular pain," and she had "multiple other neurologic symptoms with

diplopia,[12] disequilibrium and incontinence."  R. 184.  On May 2, 2001, Dr. Florek wrote

that Plaintiff was not then able to "adequately care for her child and needs assistance

for some of her daily activities."  R. 182.  The note was to request that her husband be

excused from work for 12 days.  *Id.*  On May 14, 2001, Plaintiff's MRI of her spine and

brain were reviewed by Dr. Florek.  R. 180.  The brain MRI was normal, and the spinal

---

[11] Neurontin is indicated for management of postherpetic neuralgia and as an adjunctive therapy in the treatment of partial seizures.  Physicians' Desk Reference (2005).

[12] Diplopia is the perception of two images of a single object, double vision.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

MRI was essentially normal.  *Id.*  A trial of amitriptyline[13] was prescribed and Ultram was discontinued in view of the "minimal findings on exam."  R. 181.

On July 9, 2001, Plaintiff was last seen by Dr. Florek.  R. 179.  She had had a root canal, and complained of pain in all her teeth.  *Id.*  She described pain radiating from her left TMJ down her left shoulder and shoulder blade.  *Id.*  She was "back on Lorcet" and Elavil.[14]  *Id.*  By August 15, 2001, Plaintiff was still seeing Dr. Underwood for pain, and he expressed concern about her "growing dependency on narcotics."  R. 245.

On September 27, 2001, a deposition was taken of Dr. Rumana.[15]  R. 514.  He repeated what is said above, that Plaintiff's mother and family warned him that Plaintiff had used a lot of narcotics, and he again said that she probably had a low pain tolerance because she had taken so many narcotics.  R. 513.  Dr. Rumana also assumed that if she took lots of narcotics, she had "a lot of pain."  R. 514.  He said that "when you take a lot of narcotics you get desensitized to them and they have less effect on you."  *Id.*

On September 7, 2001, Plaintiff was referred to Robert A. Guskiewicz, M.D., at the University of Florida Anesthesia Interventional Team Management Clinic at Shands Teaching Hospital.  R. 216.  She presented for evaluation of neck and facial pain and to get pain medication.  *Id.*  She described bilateral pain down to the shoulder blades,

---

[13] Amitriptyline hydrochloride (HCL) is a tricyclic antidepressant having sedative effects; it is also used for treatment of chronic pain.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[14] Elavil is an antidepressant with sedative effects. The active ingredient is amitriptyline HCL.  PHYSICIANS' DESK REFERENCE (2005).

[15] The deposition was taken in Plaintiff's civil suit concerning her neck injury.

mainly on the left.  *Id.*  She was then taking Darvocet.  *Id.*  Dr. Guskiewicz noted a

history of asthma, bipolar disorder with panic and anxiety and an obsessive compulsive

component.  *Id.*  Upon examination, Dr. Guskiewicz noted pain trigger points along the

vertebral muscles of the neck down to the sacrum, with weakness of the left shoulder,

but with full neck range of motion.  R. 218.  Dr. Guskiewicz's assessment was:

> cervicalgia due to disk disease due to positive axonal compression tests
> and facet arthropathy due to tender left facet joints on palpation by
> examination and also myofascial spasms due to tenderness and tender
> and trigger point [sic] felt by palpation on examination.  The patient has
> radiculopathy in the distribution of C5 to C8 bilaterally.  The patient has
> atypical facial pain.

R. 218.  Dr. Guskiewicz referred Plaintiff for a pain psychology evaluation and a cervical

x-ray.  *Id.*

On October 4, 2001, Dr. Guskiewicz met with Lori Waxenburg, Ph.D., from the

pain psychology department.  R. 219.  Dr. Waxenburg had not known that Plaintiff was

seeing a psychiatrist and had been prescribed Valium, and she said that Plaintiff had a

"longstanding history of distress as well as catastrophizing and somatozing."  *Id.*  There

was concern about giving Plaintiff opioid medications.  *Id.*  These were described by Dr.

Guskiewicz as "significant red flags."  *Id.*  Plaintiff was to be referred to a pain

psychologist in Tallahassee where she lived.  *Id.*

Plaintiff was seen again the next day, October 5, 2001.  R. 221.  Dr. Guskiewicz

said that Plaintiff reported intense pain in the neck, not relieved with Lortab.  *Id.*  A

prescription for Duragesic patches was provided and 30 Ultram tablets for

"breakthrough pain."  *Id.*  He also discussed the possibility of facet injections especially

relating to the hardware in her neck.  *Id.*

On November 30, 2001, Plaintiff reported that the patches had caused inflammation of the skin.  R. 223.  Plaintiff was taking 8 Norco[16] tablets a day, and said she had not felt that good in several years.  *Id.*  Dr. Guskiewicz switched her to OxyContin.  R. 224.  On December 11, 2001, there is a note that Plaintiff said the OxyContin was making her sick, and she was told to stop the OxyContin and continue to use the Norco.  R. 225.  She stopped the OxyContin and had withdrawal symptoms. *Id.*

On January 4, 2002, Dr. Guskiewicz discharged Plaintiff from his care.  R. 226.  A few months later, on May 9, 2002, Dr. Underwood noted that Plaintiff had been discharged by Dr. Guskiewicz because she "overutilized one of the pain medicines."  R. 237-238.  Dr. Underwood also said that Plaintiff did not appear to be in pain during the May visit.  R. 237.

On June 4, 2002, Plaintiff was seen by Shane Rignanese, M.D.  R. 235.  He prescribed Vicodin and Ultram.  *Id.*

On September 16, 2002, Plaintiff had a cervical spine MRI on referral by Dr. Rignanese.  R. 591.  The relevant abnormal findings were:

> Asymmetric left facet arthropathy at C5-6 is present, which is moderate severity.  It is associated with slight anterolisthesis of the left C5 vertebral Body.  The listhesis and facet arthropathy produce mild to moderate left foraminal stenosis, which may correlate with the left upper extremity radiculopathy, given the lack of other findings.

R. 592.

---

[16] Norco is hydrocodone tablets with acetaminophen.  PHYSICIANS' DESK REFERENCE (2005) and DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

On January 8, 2003, Plaintiff was seen by James Thomas, M.D., because Dr. Rignanese was not in that day.  R. 617.  He observed that Plaintiff was "extremely emotional, almost out of control, panicky kind of behavior . . . ."  *Id.*  She had pain especially on the left side of her shoulder.  *Id.*  She returned the next day to see Dr. Rignanese.  R. 613.  His assessment was exacerbation of cervical disc pain, and possibly a bulging disc.  *Id.*  An x-ray on January 9, 2003, revealed mild degenerative change of the cervical spine.  R. 614.

On April 3, 2003, Plaintiff returned to Dr. Rignanese for removal of a skin lesion on her right chin.  R. 608.  She reported "she is really doing well."  *Id.*  She was "quite cheerful and upbeat, with no signs of sedation."  *Id.*  She returned again on April 14, 2003, for suture removal.  R. 607.

On May 13, 2003, Plaintiff saw Dr. Rignanese, reporting she had been raped by a man.  R. 602.  She said she initially did not report this assault but recently had told her husband and the police, and the perpetrator had been arrested.  *Id.*

On June 25, 2003, Dr. Rignanese saw Plaintiff again.  R. 599.  He noted she was taking Zyprexa[17] for "racing thoughts and decreased emotional lability."  *Id.*  His assessment was chronic neck pain, chronic abdominal pain, but he did not refill her Darvocet.  *Id.*  He planned to wean her from Lortab.  *Id.*  He noted she had a low pain threshold and that she should tell her gynecologist, who was to perform a hysterectomy for endometriosis.  *Id.*

---

[17] Zyprexa is a psychotropic agent used for the treatment of schizophrenia and as a short-term treatment for manic episodes associated with Bipolar I disorder.  <u>Physicians' Desk Reference</u> (2005).

On August 4, 2003, Dr. Rignanese saw Plaintiff after the hysterectomy.  R. 598.

The surgical wound had dehisced,[18] causing pain, and he prescribed Darvocet.  On

August 11, 2003, Plaintiff had to go to the emergency room with a fever of 102 degrees

and infection in the wound, with pain greater than her neck pain.  R. 597.  Dr.

Rignanese said "Unfortunately, we caught her on several lies, in regards to her narcotic

prescriptions, and it seems like she has fallen back into narcotic dependency and abuse

again."  *Id.*  Nonetheless, he prescribed Darvocet.  *Id.*  On August 26, 2003, Dr.

Rignanese said that Plaintiff had chronic neck pain, and wrote: "a difficult situation,

walking a tight wire between pain relief and addiction."  R. 596.  She was to go to the

Mayo Clinic and hoped to get epidural steroid injections.  *Id.*  He again prescribed

Darvocet, and encouraged her to swim again.  *Id.*  On September 8, 2003, Dr.

Rignanese discussed Plaintiff's case with Dr. Rumana, noting that she had been

discharged from "multiple practices about town, for multiple medication fills."  R. 595.

Dr. Rumana thought she would be an ideal candidate for a pain clinic, but was not sure

whether she had been discharged from one such clinic and noted she had been "denied

at Shands."  *Id.*

Plaintiff was seen by George J. Arcos, D.O., of The Pain Center of Anesthesia

Cooperative of Tallahassee, on January 9, 2004.  R. 435.  She had gone to Anesthesia

Associates for two cervical steroid injections, but she moved and the injections were

unsuccessful.  *Id.*  Plaintiff complained of constant pain over the lower cervical region,

both shoulders, intrascapular regions, and both arms.  *Id.*  She said her pain was worse

---

[18] Dehiscence is a splitting open.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

with driving or anything that required concentration and an immobile cervical positions.

*Id.* She was then on a Duragesic patch and was taking Norco. *Id.* Plaintiff "admitted to depression, anxiety, useless feelings, poor memory, crying, irritability, and poor concentration." R. 436. Upon examination, Dr. Arcos found that Plaintiff had swelling of the ankles, neurologically was notable for forgetfulness and headache, and had a poor appetite and excessive thirst and nausea. *Id.* She appeared "somewhat somnolent and tearful . . . in emotional distress relative to her pain complaints that seems to be amplified." R. 437. Examination of the neck revealed tenderness and significant muscle spasm. *Id.* His assessment was post laminectomy syndrome C5 through C7, facet arthropathy worse at C5 and C6, with left foraminal stenosis, severe myofascial pain syndrome with postural imbalance of the cervical spine and suboccipital spasm, and opioid dependence. R. 438. Dr. Arcos counseled Plaintiff about the habituation potentials of Duragesic, and noted that Plaintiff had pupillary constriction and diaphoresis. *Id.* He explained he would not use Duragesic for myofascial pain. *Id.* He planned to wean her from Duragesic, to replace it with Methadone. *Id.* He said that for her myofascial pain, Plaintiff needed trigger point injections with active physical therapy and postural correction and training. *Id.*

On January 23, 2004, Dr. Arcos entered a progress note, finding that Plaintiff presented initially with "severe cervical pain radiating to the upper extremities, left greater than right." R. 434. He found that she "showed evidence of severe myofascial pain syndrome in the upper extremity." *Id.* On this visit, Plaintiff had decreased her use of Duragesic as instructed. *Id.* He noted that Plaintiff had not been able to do physical

therapy "since TMH is her only approved site and this has not resulted in any benefit to her in the past."  *Id.*

On February 5, 2004, Dr. Arcos saw Plaintiff again.  R. 433.  He noted that she had discontinued Duragesic.  *Id.*  He had to discharge her "due to recent developments" with her health maintenance organization, CHP (Capital Health Plan). *Id.*  He returned Plaintiff to the care of Dr. Park.  R. 432.

**Mental Health Evidence**

Dennis E. Platt, M.D., a psychiatrist, began his treatment of Plaintiff on November 29, 1999, shortly after the confrontation with Dr. Knight.  R. 380-382.  Plaintiff told Dr. Platt that she suffered "near-choking anxiety," and could not stay focused on a movie or television.  R. 381.  Plaintiff told Dr. Platt that she was taking Valium "usually 3 times a day" and he noted "probable benzodiazepine dependence."  *Id.*  On examination, Dr. Platt found that Plaintiff spoke rapidly with very pressured speech and flights of ideas, but without signs of hallucinations, delusions, paranoia, or anxiety.  *Id.*  He determined that she "clearly has manic and hypomanic symptoms . . . ."  *Id.*  His diagnosis was bipolar-affective disorder II, and possible narcotic analgesic dependence.  *Id.*  He assigned a GAF score of 35.  *Id.*  He advised Plaintiff he would under no circumstances prescribe analgesics.  *Id.*  He prescribed Lithium and Depakote.[19]  R. 382.  He prescribed Valium because he did not want her to withdraw from it.  *Id.*

Dr. Platt note on February 15, 2000, that Plaintiff was suffering significant withdrawal symptoms and he offered her the option of coming to the hospital for detox,

---

[19] Depakote is used for manic episodes associated with bipolar disorder, epilepsy, and migraine headaches.   PHYSICIANS' DESK REFERENCE (2005).

but she declined.  R. 378.  On a visit on March 20, 2000, Plaintiff was doing much

better.  *Id.*  He warned of Valium addiction.  *Id.*  Dr. Platt was trying to reduce the Valium

intake again on June 19, 2000.  R. 377.  He did not think the low dose of Lithium was

sufficient, and thought he might change that medication.  *Id.*

On July 8, 2000, Plaintiff suffered the accident at a Target store, and had neck

surgery shortly thereafter.  She had started having recurrent panic attacks.  R. 376.  He

thought her mood was stable, and was checking her Lithium level.  *Id.*  On October 2,

2000, Plaintiff reported she had been treated by Donna Gillette, Ph.D., with

biofeedback, and this was helping her to relax.  R. 375.  Plaintiff was upset that Dr.

Meyer had discharged her from care for abuse of pain medication.  *Id.*  She continued to

relive the accident at Target, with boxes falling on her head and trying to protect her

infant.  *Id.*  She returned on October 23, 2000, and was "doing extremely well from a

psychiatric standpoint."  *Id.*  He found no cognitive dysfunction with her medication.  *Id.*

She seemed "fairly stable" overall.  *Id.*

On November 27, 2000, Dr. Platt found Plaintiff to be in a hypomanic state.  R.

374.  Dr. Platt increased the dose of Lithium.  *Id.*  She said her mind was "racing" at

times.  *Id.*  By December 11, 2000, Plaintiff had been compliant with the prescribed

dosages of Lithium and Valium, and was no longer hypomanic.  *Id.*  Dr. Platt thought

that the increased Lithium must have helped.  *Id.*

On January 5, 2001, Plaintiff complained that the Lithium levels made her tired.

R. 373.  Plaintiff did not want to take Depakote due to weight gain and potential side

effects.  *Id.*  Dr. Platt prescribed Neurontin, though it was not approved by the FDA for

treatment of bipolar disorder, that is, it was an "off label" use, and he told Plaintiff it

would have sedative effects that might alleviate her neck pain. *Id.* The plan was to slowly decrease the Lithium level. *Id.* Plaintiff related that she had expectations of a large jury verdict in her suit against Target Stores. *Id.* By January 25, 2001, Plaintiff reported she was feeling very good, without manic or hypomanic symptoms. R. 372. Plaintiff was anxious about the suit she had filed against Target. *Id.* She was more anxious on February 6, 2001. *Id.* On March 6, 2001, Dr. Platt noted she was very anxious, had gone through a deposition in her civil case, but thought this was only situational and would resolve. R. 371. On April 10, 2001, Dr. Platt saw Plaintiff, reviewed her medications, noted that she continued to suffer stress from the law suit, but found that she had no manic or hypomanic symptoms. R. 370. She was then taking Neurontin, Valium, and Remeron as prescribed by Dr. Platt, in addition to pain medications. *Id.* On April 30, 2001, there were still no signs of mania or hypomania; Plaintiff did not seem to be falling into depression and seemed to be doing pretty good. R. 369. Dr. Platt increased the dosage of neurontin. *Id.*

On May 22, 2001, Plaintiff was a "bit hypomanic," but had not increased her intake of neurontin as prescribed. R. 367. Dr. Platt found that the Remeron and Valium were not affecting Plaintiff cognitively, and Plaintiff was able to drive. *Id.* On June 6, 2001, Plaintiff described "up and down" mood swings, but nothing requiring hospitalization. R. 366. He prescribed Trileptal for the mood swings, noting it was not approved by the FDA for treatment of bipolar disorder but had proved helpful in practice. *Id.* He planned to reduce the Neurontin dosage because it was making Plaintiff sleepy. *Id.*

On June 21, 2001, Plaintiff reported that she had begun to have pain in her teeth and had suffered a panic attack.  R. 364.  The civil trial had been continued to October.  *Id.*  She was taking Neurontin, Valium, and Remeron, but not Trileptal.  *Id.*  Her mood seemed "quite stable."  *Id.*  Dr. Platt decided to substitute Lamictal for the Trileptal, noting that she could not tolerate Trileptal, and Lithium and Neurontin had made her tired.  *Id.*

Dr. Platt saw Plaintiff again on July 23, 2001.  R. 362.  He said that she had to stop taking both Lamictal and Trileptal because they made her too sedated.  *Id.*  She went back to Neurontin because it helped with pain as well as moods, finding it caused some drowsiness, but not like the other medications.  *Id.*  Dr. Platt noted that in two studies, Neurontin had not proved effective in the treatment of bipolar disorder, but he said he found it effective in treatment of Plaintiff's condition.  *Id.*  Dr. Platt found that Plaintiff and her husband were having financial troubles and stress concerning the pending civil lawsuit, but he found that her bipolar disorder was controlled with Neurontin.  *Id.*  There were no signs of mania or hypomania.  *Id.*  Plaintiff related that due to her neck injury, she could no longer go fishing or riding the four wheeler in the woods or other fun physical things.  *Id.*  Plaintiff agreed to begin taking Depakote.  R. 363.

Plaintiff stopped taking Neurontin and Depakote by August 20, 2001, thinking that it had caused her hair to thin.  R. 361.  She agreed to start Neurontin again, though she was counseled that studies had shown it to be ineffective with bipolar disorder.  On October 9, 2001, there is a lengthy note discussing the interactions of pain medication (Duragesic patch) and the medications prescribed by Dr. Platt, and a finding that

Plaintiff had no deficits in cognition, no depression, no mania or hypomania, and had only anxiety.  *Id.*

On January 14, 2002, Dr. Platt noted that Plaintiff did not want to take OxyContin due to things she had learned from news programs about this drug, and she admitted she had had a substance abuse problem in the past.  R. 358.  Dr. Platt noted that the pain clinic had discharged her from care, and he said he thought that Plaintiff had always been "honest and up front with me," and he said he had "no reason to suspect that she is fabricating anything."  *Id.*  He said "she has pain."  *Id.*  He found no abnormalities upon mental health examination, specifically finding no mania, hypomania, or depressive symptomatology.  *Id.*  Plaintiff denied having a current substance abuse problem, saying that "nothing is farther from the truth."  R. 359.

On February 15, 2002, Dr. Platt tried to reduce the dosage of Valium to 5 milligrams per day.  R. 357.  He said that it was, in Plaintiff's case, habit forming.  *Id.*

On April 2, 2002, Plaintiff said she had had hypomanic feelings and some degree of racing thoughts.  R. 355.  Dr. Platt again told her that Neurontin was not thought to be effective with bipolar disorder, according to recent studies, and he wanted to explore some other treatment.  *Id.*  He noted that she had adverse side effects with Lithium, Depakote, and Tegretol, and had tried Lamictal and Trileptal, and thus she had "tried pretty much everything."  *Id.*  He decided to continue Neurontin.  *Id.*  Dr. Platt's diagnostic impression was mania and depression, mixed at this time.  R. 356.

On April 22, 2002, it was noted that Plaintiff had lost her civil case against Target but was "taking it fairly well."  R. 353.  She was stable, with no mania or hypomania.  *Id.*

A past history of narcotic dependency and stable post traumatic stress disorder was noted. *Id.* Dr. Platt thought that the stress level was reducing. *Id.*

On July 10, 2002, Dr. Platt filled out a "mental status" form in connection with Plaintiff's claim for disability benefits. R. 351-352. His diagnosis was bipolar affective disorder and post traumatic stress disorder. R. 351. He found cervical problems and asthma on Axis III, and severe stressors on Axis IV. *Id.* He found Plaintiff to be cooperative, tearful, and anxious, and her mood depressed. *Id.* Her recent and remote memory was unimpaired. R. 352. Dr. Platt's prognosis was "fair with adequate treatment." *Id.*

On August 15, 2002, Plaintiff reported that she was having up and down mood swings. R. 350. She was experiencing high energy periods and periods of depression. *Id.* She felt so depressed she did not want to take a shower. *Id.* Dr. Platt noted that she was still taking Neurontin, but this was "more for her neuropathic pain." *Id.* He prescribed Topamax.[20] *Id.* Dr. Platt's diagnosis was that Plaintiff was in a depressed phase of her bipolar disorder. *Id.*

On November 26, 2002, Dr. Platt found Plaintiff to be a "little bit hypomanic" ("high energy and euphoria") and was having "some degree of mood instability." R. 461-462. Dr. Platt decided to try Tegretol[21] to stabilize her mood. *Id.* He found that she had a past history of substance abuse, but that this was in remission. R. 462.

---

[20] Topamax is an antiepileptic drug. PHYSICIANS' DESK REFERENCE (2005).

[21] Tegretol is used as an anticonvulsant medication. PHYSICIANS' DESK REFERENCE (2005).

On January 3, 2003, Plaintiff reported that she was still taking Remeron, Neurontin, and Valium but Tegretol had caused facial acne and she stopped taking it. R. 460.  Dr. Platt wrote that "we have tried desperately to use an appropriate mood stabilizer such as Tegretol, but we are stuck with Neurontin, Valium and Remeron at this point in time." *Id.*  He said that Plaintiff's mood was "stable to a certain degree." *Id.* The mental status examination revealed no mania, hypomania, hallucinations, delusions, or paranoia. *Id.*

On April 4, 2003, Plaintiff reported to Dr. Platt that she had "lost sight of good judgment" and let two men into her house who sexually assaulted her.  R. 456.  The remainder of the medical note reviews the medications and prescribed Zyprexa. *Id.* She returned on April 14, 2003.  R. 455.  Dr. Platt said again reviewed all of the medications that had not worked and said that "she really needs a mood stabilizer." *Id.* Dr. Platt saw Plaintiff again on May 9, 2003, and she did not seem to be having post traumatic stress disorder related to the recent sexual assault.  R. 454.  Dr. Platt said that "overall she is dealing with this assault issue pretty well." *Id.*  The mental health examination was much the same as in the other visits, with no mania or hypomania observed. *Id.*

On June 27, 2003, Plaintiff reported to Dr. Platt that the Zyprexa was stabilizing her mood "fairly well."  R. 452.  On August 23, 2003, Plaintiff said that she lost the appeal of her civil case against Target, and took the news "fairly well."  R. 450.  She said that Zyprexa had really helped her. *Id.*  She had not had any bad side effects from this medication, though again Dr. Platt explained the potential adverse side effects. *Id.*

He noted that Zyprexa was only for short-term treatment of mania, not for "maintenance."  *Id*.  Her mental health status was normal.  *Id*.

On September 27, 2003, Plaintiff confessed to taking Ritalin provided by a friend. R. 448.  Dr. Platt told her that he would not prescribe Ritalin (methylpenidate) and Valium at the same time, and would prescribe Strattera, a new non-addictive medication, if it was indicated after a workup.  *Id*.  He noted she was then using a Duragesic patch for pain, and was scheduled to be seen on October 8, 2003, at the orthopedic clinic due to the results of a recent MRI.  *Id*.  It was noted that she had been "doing so well that she has been putting in a full 20 hours or so per week volunteering at her son's school."  R. 449.

By February 16, 2004, Dr. Platt reported that psychological testing determined that Plaintiff has attention deficit hyperactive disorder (ADHD).  R. 442.  Dr. Platt prescribed Concerta[22] for the ADHD, with discontinuation of Valium, BuSpar for post traumatic stress disorder, and Neurontin for bipolar disorder.  *Id*.

On April 14, 2004, Plaintiff said that Concerta had helped her "in a tremendous way," and she said she could "concentrate better." R. 441.  She had no adverse side effects.  *Id*.  Dr. Platt found that Plaintiff was not then abusing substances, and her post traumatic stress disorder seemed to be stabilizing.  *Id*.  She did not have any side effects of medication.

Plaintiff continued to report improvement on May 14, 2004.  R. 440.  Concerta was helpful.  *Id*.  She said that she and her husband had an 18 foot fishing boat, and

---

[22] Concerta (methylphenidate) is a central nervous system stimulant used to treat Attention Deficit Hyperactivity Disorder (ADHD).  PHYSICIANS' DESK REFERENCE (2005).

she and her husband and son were able to fish, and she was very happy about that.  *Id.*

Dr. Platt said that "things" were good and "she feels pretty good."  *Id.*  There were no

side effects of the medications, and no headaches.  *Id.*  Her mental health status was

normal.  *Id.*

On June 7, 2004, Dr. Platt completed a Mental Residual Functional Capacity

assessment form.  R. 464-467.  He determined that Plaintiff was extremely limited in her

ability to interact socially, that is, to accept instruction or respond appropriately to

criticism from supervisors, to work in coordination with or in proximity with others, to

respond appropriately to co-workers, and to relate to the public and maintain socially

appropriate behavior.  R. 464.  An extreme limitation was defined as having "no useful

ability to function in a work setting."  *Id.*  He said that his opinion would not change if

Plaintiff had only "minimal contact or interaction with others."  R. 465.  Dr. Platt also

thought that Plaintiff had extreme impairments in her ability to "perform and complete

work tasks in a normal day or work at a consistent pace," and "perform at production

levels expected by most employers."  R. 465.  He also thought that Plaintiff had extreme

limitations in her ability to remember locations and workday procedures and

instructions, to be aware of normal hazards and take necessary precautions, and to

behave predictably, reliably, and in an emotionally stable manner.  R. 466.  He thought

Plaintiff had "marked" limitation in her ability to work in cooperation or proximity to

others without distracting them, to process subjective information accurately and to use

appropriate judgment, to carry through instructions and complete tasks independently,

to maintain attention and concentration for more than brief periods, to perform at

production levels expected by most employers, to respond appropriately to changes in a

work setting, and to tolerate customary work pressures.  R. 465-466.  A marked

limitation was defined as seriously affecting a person's ability to function in a work

setting.  R. 464.  He thought that Plaintiff's impairment would become worse under

stress in a job.  R. 466.  He wrote that Plaintiff "absolutely cannot handle stress of any

type," and said that she "fairly easily 'breaks down' under minimal stress."  *Id.*  He also

said that her impairments were caused by mood swings that she still had because she

could not tolerate most medications.  *Id.*  Dr. Platt said that the limitations he observed

had lasted from November 29, 1999, when he first started treating Plaintiff, until the date

he rendered his opinion, on June 14, 2004.  R. 467.

A psychological consultative examination was performed on January 21, 2004,

by Larry Kubiak, Ph.D., who administered seven tests and made behavioral

observations.  R. 418-425.  On tests, he found 8 of 9 symptoms of inattentive aspects of

ADHD and 7 of 9 of hyperactive or impulse disorder.  R. 420.  On one test, clinically

significant findings occurred with respect to inattention and memory and self-concept.

*Id.*  On the Copeland Symptoms Checklist for Adult Attention Deficit Disorders "she was

in the severe range in terms of inattention/distractibility," and in the moderate to severe

range for "emotional difficulties, underactivity, overactivity/hyperactivity, and impulsivity."

*Id.*  Plaintiff scored 37 on the Wender Utah Rating Scale, which was the mean for

women with depression.  R. 421.  His diagnosis on Axis I was attention deficit

hyperactivity disorder, bipolar disorder.  R. 424.  On Axis II the diagnosis was

depressive personality with avoidant and schizoid features, and dependent personality

with self-defeating features.  *Id.*  He noted numerous physical problems on Axis III, and,

on Axis V, assigned a GAF score of 40.  *Id*.  On Axis IV he found "disability, difficulty

functioning in all life areas."  *Id*.

**Legal analysis**

The order of analysis in this report and recommendation does not follow the

order presented by Plaintiff.  It is without dispute that Plaintiff became addicted to pain

medications.  Consequently, the central issue is whether the Administrative Law Judge

properly evaluated this undisputed fact in light of all of the evidence of record.

Drug addiction must be evaluated pursuant to special rules.  "An individual shall

not be considered to be disabled for purposes of this subchapter if alcoholism or drug

addiction would (but for this subparagraph) be a contributing factor material to the

Commissioner's determination that the individual is disabled."  42 U.S.C. S 423(d)(2)(C).

"[T]he claimant bears the burden of proving that his alcoholism or drug addiction is not a

contributing factor material to his disability determination."  Doughty v. Apfel, 245 F.3d

1274, 1280 (11th Cir. 2001).[23]  "The key factor we will examine in determining whether

drug addiction or alcoholism is a contributing factor material to the determination of

disability is whether we would still find you disabled if you stopped using drugs or

alcohol."  20 C.F.R. § 404.1535(b)(1).

> (2) In making this determination, we will evaluate which of your current
> physical and mental limitations, upon which we based our current disability

---

[23] "If the ALJ is unable to determine whether substance use disorders are a
contributing factor material to the claimant's otherwise-acknowledged disability, the
claimant's burden has been met and an award of benefits must follow."  Brueggemann
v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003).  "A finding of disability is, in effect, a
'condition precedent' to applying the special rule on alcoholism and drug addiction."  *Id*.,
citing 20 C.F.R. § 404.1535 and Frank S. Bloch, BLOCH ON SOCIAL SECURITY § 3.39
(2003).

determination, would remain if you stopped using drugs or alcohol and
then determine whether any or all of your remaining limitations would be
disabling.

> (i) If we determine that your remaining limitations would not
> be disabling, we will find that your drug addiction or
> alcoholism is a contributing factor material to the
> determination of disability.

> (ii) If we determine that your remaining limitations are
> disabling, you are disabled independent of your drug
> addiction or alcoholism and we will find that your drug
> addiction or alcoholism is not a contributing factor material to
> the determination of disability.

20 C.F.R. § 404.1535(b)(2).

The Administrative Law Judge first considered all of the effects of Plaintiff's
abuse of pain medications and determined that she was disabled.  R. 28.  He then
sought to determine whether Plaintiff's "narcotic pain medication dependency was
material to disability."  *Id*.  He correctly said that the test is "whether the cessation of
drug . . . abuse would render the claimant no longer disabled." *Id*.  He concluded that
had Plaintiff abstained from abuse of narcotic pain medications, she would have had the
physical residual functional capacity to perform light work with limitations.  R. 28-29.
Thus, he applied the proper law for his evaluation.

The remaining question, therefore, is whether the ALJ's conclusion as to whether
Plaintiff's prescription medication addiction was a contributing factor material to the
disability determination is supported by substantial evidence in the record.  In making
this determination, the Administrative Law Judge reasoned:

> In this case, the medical record was rife with indications of the claimant's
> disingenuousness and drug seeking behavior.  It seems apparent that
> many of her subjective complaints were calculated to obtain multiple
> prescriptions for narcotic pain medications (and perhaps to enhance the

> value of her personal injury lawsuit with which she was preoccupied).
> During the period of time herein at issue, the record indicated that the
> claimant did experience some marital and financial difficulties, as well as
> episodes of anxiety and insomnia.  Her mood was generally stable,
> however, and her physical complaints were consistently out of proportion
> to the objective findings as previously discussed.  The undersigned finds
> that the claimant's primary problem between July 2000 and December
> 2001 was her dependency on prescription narcotic pain medications.  The
> undersigned, therefore, concludes that the claimant's chronic and long-
> term abuse of narcotic pain medications was a contributing factor material
> to her disability during the period herein being considered.

R. 28.

In summary, therefore, the Administrative Law Judge reasoned that (1) Plaintiff's

physical complaints were out of proportion to the objective medical evidence; (2) many

of her subjective complaints of pain were untrue and only calculated to obtain pain

medications to abuse, not for pain management; and (3) her mental health limitations

were only mild to moderate.

There are well-established rules for the evaluation of a claimant's pain testimony

and the opinions of treating physicians.  Pain and other symptoms reasonably attributed

to a medically determinable impairment are relevant evidence for determining residual

functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may

affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so.  *See Hale v.
> Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,

that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for

disregarding the claimant's subjective pain testimony must be based upon substantial

evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain

standard if his findings "leave no doubt as to the appropriate result" under the law.

Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

        "A claimant's subjective testimony supported by medical evidence that satisfies

the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain

situations, pain alone can be disabling, even when its existence is unsupported by

objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations

omitted).  "[W]here proof of a disability is based upon subjective evidence and a

credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ

must either explicitly discredit such testimony or the implication must be so clear as to

amount to a specific credibility finding."  *Id.* at 1562, *quoting*, Tieniber v. Heckler, 720

F.2d 1251, 1255 (11th Cir. 1983).

        Similarly, the opinion of a claimant's treating physician must be accorded

considerable weight by the Commissioner unless good cause is shown to the contrary.

Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  The reasons for giving little

weight to the opinion of a treating physician must be supported by substantial evidence.

Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).  This circuit finds good cause to

afford less weight to the opinion of a treating physician "when the: (1) treating

physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary

finding; or (3) treating physician's opinion was conclusory or inconsistent with the

doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir.

2004).  The ALJ must clearly articulate the reasons for rejecting the treating physician's

opinion.  *Id.*

> The Secretary must specify what weight is given to a treating physician's
> opinion and any reason for giving it no weight, and failure to do so is
> reversible error. . . .  Where the Secretary has ignored or failed properly to
> refute a treating physician's testimony, we hold as a matter of law that he
> has accepted it as true.

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

### Evaluation of the severity of pain experienced by Plaintiff

The Administrative Law Judge determined that although "the evidence showed

that the claimant had medically determinable impairments that could reasonably be

expected to produce some of the pain and other symptoms alleged, the evidence did

not support an award of benefits."  R. 28.  He also determined, as noted above, that

Plaintiff's "physical complaints were consistently out of proportion to the objective

findings."  *Id.*

While not recounting all of the negative objective medical evidence discussed

above, on September 28, 2000, several months after the surgery, Dr. Rumana found

that Plaintiff's right arm pain was gone but she had begun to experience left arm pain.

R. 207.  His motor examination of Plaintiff was essentially normal.  *Id.*  On October 17,

2000, Dr. Rumana reviewed an MRI scan and determined that there was "no evidence

of disc herniation or nerve root compression" and "nothing towards the left-side nerve

roots."  R. 205.  He said that an EMG nerve condition velocity study was also normal.

*Id.*  Dr. Rumana did not think Plaintiff needed any further neurosurgical care.  R. 202.

On April 3, 2001, Dr. Florek said that nerve conduction studies of the left side

were normal, though an "upper motor neuron type pattern" was suggested.  R. 185.

However, on April 19, 2001, Dr. Forek said that Plaintiff had "persistent left upper

extremity radicular pain," and she had "multiple other neurologic symptoms with

diplopia,[24] disequilibrium and incontinence."  R. 184.  On May 2, 2001, Dr. Florek wrote

that Plaintiff was not then able to "adequately care for her child and needs assistance

for some of her daily activities."  R. 182.  On May 14, 2001, an MRI of Plaintiff's spine

and brain were found to be essentially normal.  R. 180.  Dr. Florek referred to this as

"minimal findings on exam."  R. 181.

On September 7, 2001, Dr. Guskiewicz noted pain trigger points along the

vertebral muscles of the neck down to the sacrum, with weakness of the left shoulder,

but with full neck range of motion.  R. 218.  Dr. Guskiewicz's assessment was

"cervicalgia due to disk disease," "myofacial spasms due to tenderness and tender and

trigger point felt by palpation," "radiculopathy in the distribution of C5 to C8 bilaterally,"

and "atypical facial pain."  R. 218.

Dr. Rumana did not find Plaintiff's subjective complaints of pain to be lacking in

credibility.  He said, instead, that he thought that she if she took lots of narcotics, she

had "a lot of pain."  R. 514.  He explained that "when you take a lot of narcotics you get

desensitized to them and they have less effect on you."  *Id.*  Both Dr. Meyer and Dr.

---

[24] Diplopia is the perception of two images of a single object, double vision.
DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

Rumana felt that Plaintiff's need for pain medication was more psychological than physical.  R. 261.  On November 13, 2000, Dr. Rumana expressed the opinion that Plaintiff would "likely require significant future care and treatment" because she "continues to have a variety of other problems," and he though "she possibly will need to see a psychiatrist in the future to help her with the emotional aspects of her injury." R. 201-202.

Finally, there is substantial evidence in the record that during the last year of Plaintiff's insured status, 2001, she was still overusing pain medications.  On August 15, 2001, Dr. Underwood expressed concern about her "growing dependency on narcotics." R. 245.  On October 4, 2001, Dr. Guskiewicz had concerns about giving Plaintiff opioid medications and said there were "significant red flags."  R. 219.  On January 4, 2002, Dr. Guskiewicz discharged Plaintiff from his care because she "overutilized one of the pain medicines."  R. 226, 237-238.

In summary, while the evidence is mixed, there is substantial evidence in the record to support the Administrative Law Judge's conclusions concerning Plaintiff's physical disability and the severity of the pain she experiences.  Many of the objective medical findings for physical disability were negative.  While the physicians who treated Plaintiff's pain with opioid medications quite clearly thought that her subjective experience of pain was real enough to justify the continued prescription of potent pain medications, that experience of pain was tangled with her emotional health and the diminished efficacy of the medications due to overuse in the period prior to December 31, 2001.  Thus, there is substantial evidence in the record for the conclusion that had

Plaintiff stopped using narcotic pain medications, her experience of pain would have

been less and not significantly disabling.

### Evaluation of Plaintiff's mental health

The ALJ gave the following reasons for rejecting Dr. Platt's opinion as to

Plaintiff's residual mental functional capacity:

> This opinion [of Dr. Platt], however, is materially inconsistent with the
> weight of the medical evidence of record, including Dr. Platt's own
> progress notes and his mental status questionnaire of July 2002, in which
> he found that the claimant had good memory, fair fund of knowledge and a
> fair prognosis.

R. 27.  The ALJ elsewhere noted that Plaintiff "did experience some marital and

financial difficulties, as well as episodes of anxiety and insomnia," but her "mood was

generally stable."  R. 28.

The reasons for discounting Dr. Platt's opinion are not supported by substantial

evidence in the record.  There are a number of important findings in the mental status

questionnaire prepared by Dr. Platt on July 10, 2002, that are directly supportive of his

conclusions concerning Plaintiff's residual mental functional capacity, and none of that

report is substantial evidence to discount his opinion.  During that assessment, Dr. Platt

found Plaintiff to be cooperative, tearful,[25] and anxious.  R. 351.  He found her speech to

be fast at times, slow at times, and her mood was depressed, anxious, and at times

euphoric.  *Id.*  These are signs of active bipolar problems.  Plaintiff was found to have

no delusions or hallucinations, but then her diagnosis was bipolar disorder, not

schizophrenia.  *Id.*  Similarly, she was oriented and her memory was intact, not

---

[25] It is difficult to read this word, and it could be fearful, but the "t" beginning this word
is the same as the "t" in "times" in the next entry.

inconsistent with the impairments resulting from bipolar disorder.  R. 352.  Finally, Dr.
Platt did not say that Plaintiff's prognosis was merely "fair," as reported by the ALJ.  He
said that her prognosis was "fair *with adequate treatment*."  *Id.*, emphasis added.

The treatment that Dr. Platt attempted to provide from 1999 through the date of
last insured status, December 31, 2001, was to find a psychotropic medication to
stabilize Plaintiff's bipolar disorder.  The extreme difficulties Dr. Platt faced in finding a
bipolar medication that Plaintiff could tolerate without adverse side effects is chronicled
at length above.  The prognosis, therefore, of "fair with adequate treatment," in light of
the extreme problems Dr. Platt encountered in finding the right treatment, is not
substantial evidence in the record to discount Dr. Platt's residual mental functional
capacity assessment.  Indeed, Dr. Platt's residual mental functional capacity
assessment is entirely consistent with a prognosis that was not "fair" because he was
not confident that an "adequate treatment" had yet been found.

The Administrative Law Judge did not give any other examples of how Dr. Platt's
opinion was "materially inconsistent with the weight of the medical evidence of record"
except to say on the next page, R. 28, that her mood was stable.

While Dr. Platt did note that Plaintiff's mood was stable on many occasions when
he examined her, there are multiple entries where her mood was not stable.  On
November 29, 1999, Dr. Platt found that Plaintiff spoke rapidly with very pressured
speech and flights of ideas, and her GAF score was 35.  R. 381.  "The GAF scale
reports a 'clinician's assessment of the individual's overall level of functioning.'
*American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders*
30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).  "GAF of

31-40 is defined as a '[m]ajor impairment in several areas, such as work or school,

family relations (e.g., depressed man avoids friends, neglects family, and is unable to

work . . .)' " Thompson v. Barnhart, Case No. CIV A 05-11051-DPW, 2006 WL

2506035, * 5, n. 3, 113 Soc.Sec.Rep.Serv. 140 (D. Mass.  2006).[26]

On July 8, 2000, Plaintiff had started having recurrent panic attacks, but her

mood was stable.  R. 376.  On October 23, 2000, she was "doing extremely well from a

psychiatric standpoint" and was "fairly stable."  R. 375.  On November 27, 2000, she

was in a hypomanic state.  R. 374.  By December 11, 2000, she was no longer

hypomanic due to an increase in Lithium.  Id.  On January 5, 2001, Lithium was having

adverse effects, but Plaintiff was feeling "very good," without manic or hypomanic

symptoms.  R. 373.  She had no manic or hypomanic symptoms on April 10, 2001, and

was taking Neurontin.  R. 370.  She was still doing pretty good on April 30, 2001.  R.

369.  She was a "bit hypomanic" on May 22, 2001.  R. 367.  On June 6, 2001, Plaintiff

was having "up and down" mood swings, but Dr. Platt did not think it was serious

enough to require hospitalization.  R. 366.  The Neurotin was making Plaintiff sleepy,

however, and Dr. Platt switched to Trileptal.  Id.

On June 21, 2001, Plaintiff began to have dental pain and had a panic attack, but

Dr. Platt noted her mood was "quite stable" when he saw her.  R. 364.  On July 23,

2001, Plaintiff agreed to take Depakote.  R. 363.  Her bipolar disorder was thought to be

controlled with Neurontin, and there were no signs of mania or hypomania.  R. 362.  On

---

[26] "GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).

August 20, 2001, Plaintiff had stopped taking both Neurontin and Depakote, thinking it had caused her hair to thin.  R. 361.  On October 9, 2001, Dr. Platt found no depression, mania, or hypomania, but anxiety was present.  R. 361.

On April 2, 2002, Dr. Platt found that Plaintiff had hypomanic feelings and some degree of racing thoughts.  R. 355.  On July 10, 2002, Dr. Platt found Plaintiff to be cooperative, tearful, and anxious, and her mood depressed, and he thought her prognosis to be "fair with adequate treatment."  R. 352.  Plaintiff was again having up and down mood swings on August 15, 2002, and said she was so depressed she did not want to take a shower.  R. 350.  Dr. Platt's diagnosis was that Plaintiff was in a depressed phase of her bipolar disorder.  *Id.*  On November 26, 2002, Dr. Platt found Plaintiff to be a "little bit hypomanic" ("high energy and euphoria") and was having "some degree of mood instability."  R. 461-462.

On January 3, 2003, Plaintiff reported that she was still taking Remeron, Neurontin, and Valium, but Tegretol had caused facial acne and she had stopped taking it.  R. 460.  Dr. Platt wrote that "we have tried desperately to use an appropriate mood stabilizer such as Tegretol, but we are stuck with Neurontin, Valium and Remeron at this point in time."  *Id.*  He said that Plaintiff's mood was "stable to a certain degree."  *Id.*  The mental status examination revealed no mania, hypomania, hallucinations, delusions, or paranoia.  *Id.*

Plaintiff returned on April 14, 2003.  R. 455.  Dr. Platt reviewed all of the medications that had not worked and said that "she really needs a mood stabilizer."  *Id.*  On June 25, 2003, Dr. Rignanese saw Plaintiff again.  R. 599.  He noted she was taking Zyprexa for "racing thoughts and decreased emotional lability."  *Id*  On June 27, 2003,

Plaintiff reported to Dr. Platt that the Zyprexa was stabilizing her mood "fairly well."  R.

452.  Zyprexa, however, was only for short-term treatment of mania, not for

"maintenance."  R. 450.

In summary, the record is mixed, but the record does not contain substantial

evidence to support a conclusion that Plaintiff's mood was so stable as to be materially

inconsistent with Dr. Platt's opinion.  As a consequence, the ALJ's rejection of Dr. Platt's

residual mental functional capacity opinion is not supported by substantial evidence in

the record.

Ordinarily this would result in a finding that the Commissioner has accepted that

opinion as true.  MacGregor v. Bowen, 786 F.2d at 1053.  There are some unanswered

questions, however.

First, even if the residual mental functional capacity of Dr. Platt should have been

given substantial weight, it is uncertain whether Plaintiff's mental impairments in the

period before December 31, 2001, would have been resolved had she stopped abusing

pain medications.  Dr. Platt would have an opinion about that, but he was not asked to

render such an opinion.  He should have been asked for that opinion, given the special

complexities of this case.  There is evidence that by 2004, Plaintiff was no longer

abusing pain medications, R. 441, and Dr. Platt may have been able to give such an

opinion with greater confidence.

Further, in February through May, 2004, Plaintiff started doing quite well on

Concerta for the newly diagnosed condition of attention deficit hyperactivity disorder.  R.

440-441.  She had no adverse side effects.  *Id.*  As just mentioned, Dr. Platt found that

Plaintiff was not then abusing substances, and her post traumatic stress disorder seemed to be stabilizing.  R. 441.  She did not have any side effects of medication.  *Id.*

It is unknown whether Plaintiff developed attention deficit hyperactivity disorder after her insured status expired, but that is unlikely.  This condition, like bipolar disorder, perhaps does not have a sudden onset like the flu, and may exist undiagnosed for years.  If the condition was unknown to Dr. Platt in the years 1999 to 2003, probably it was unknown to Plaintiff.  It may also be that with medication for attention deficit hyperactivity disorder, Plaintiff's residual mental functional capacity may now be adequate to perform some kind of work.  There is a reasonable suggestion of that in this record, since Concerta seemed to have been of great help.

Dr. Platt's mental health residual functional capacity opinion was rendered in June, 2004, shortly after Plaintiff began to have good results with Concerta.  It is unclear whether Dr. Platt took into consideration the new diagnosis and the good results from this medication.

Accordingly, the opinions of the treating physicians as to Plaintiff's mental health are incomplete.  Where there is an ambiguity in the treating physician's records or opinion, the Administrative Law Judge should take steps to clarify it:

> Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000).[27]  The Commissioner's regulations provide that if "the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled," "[w]e will first recontact your treating physician . . . to determine whether the additional information we need is readily available.  *We will seek additional evidence or clarification from your medical source when the report from our medical source contains a conflict or ambiguity that must be resolved . . . .*"  20 C.F.R. § 404.1512(e)(1) (emphasis added).  *See also*, Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.")).

For these reasons, a remand is recommended.  If a remand is ordered, the Commissioner may address Plaintiff's contention that the procedures required by 20 C.F.R. § 404.1520a, for evaluation of mental impairments, was not followed.  In particular, that regulation sets forth a "technique" for determining a claimant's residual mental functional capacity.  20 C.F.R. § 404.1520a(d)(3) and (e).

---

[27] "Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ."  Sims v. Apfel,  530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), citing Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).  "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record."  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997), *citing*, Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  This basic duty exists whether or not the claimant is represented. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995) (citation omitted).

### Whether the Commissioner should assign the claim to another Administrative Law Judge

Plaintiff argues that if this case is remanded, it should be assigned for hearing before another Administrative Law Judge.  This argument is persuasive.

At the beginning of the administrative hearing, the Administrative Law Judge decided not to hear any testimony as to "any events that transpired" after December 31, 2001, the last date that Plaintiff was insured for disability purposes.  R. 37.  The ALJ refused to permit testimony from Plaintiff about her mental status after December 31, 2001.  R. 70.

Though the ALJ did discuss medical evidence in the record after December 31, 2001, it is unclear whether he discounted such evidence as not relevant to the claim.  It was error to limit the testimony at the hearing.  A claimant must show onset of disability prior to expiration of the claimant's insured status to be eligible for disability insurance benefits.  42 U.S.C. § 423(a) and (c); Ware v. Schweiker, 651 F.2d 408, 411 (5th Cir. 1981), *cert. denied*, 444 U.S. 952 (1979); Milam v. Bowen, 782 F.2d 1284, 1286 (1986).  But a claimant must also show that the disability "has lasted or can be expected to last for a continuous period of not less than 12 months."  Thus, at a minimum, the year after insured status expires is a relevant period for evidence.  Moreover, since a disability for social security purposes must last more than one year, that a disability has lasted unchanged for several years after the expiration of the insured status may be supportive of the claim that the disability existed for some period before the insured status ended.

The Administrative Law Judge spent much of the time during this hearing confronting Plaintiff with the fact that treating physicians had noted in the records that

she had misused pain medications.  E.g., R. 48, 50, 53, 54, 55, 56, 57, 59, 60.  While some of this questioning was appropriate (to test Plaintiff's credibility and the extent of her addiction to prescription medications), other portions seem unfair in tone or simply beside the point of ascertaining disability notwithstanding abuse of pain medications.

For example, the ALJ asked Plaintiff whether she was taking pain relieving medications prior to her neck accident in the summer of 2000.  R. 53.  She said no.  *Id.* She then remembered that before her neck accident, she had experienced migraine headaches and had been taking pain medications for that.  *Id.*  She later explained that she "forgot.  I don't have a good memory.  I have memory problems."  R. 54.  The ALJ rejoined: "I see.  Now it's a bad memory."  *Id.*  He then asked whether she had been refused treatment and she said "Yes.  I have been turned away."  *Id.*  Later she admitted that she had been in "a lot of pain, and I did take more of the medication than I was supposed to."  R. 55.

The ALJ asked Plaintiff whether she told Dr. Platt that she had not had any problem taking prescription medications, and when she said she did not remember, he said:  "Well, that's what it says here."  R. 59.  There is truth to the assertion in this question, and indeed, at the hearing Plaintiff denied having any problem with the use of narcotics, R. 48, though the temporal aspect of the question was unclear.[28]  But the implication that Plaintiff had falsely said this to Dr. Platt is not supported by substantial evidence in the record.  At the first meeting with Dr. Platt on November 29, 1999, Plaintiff said that she was taking Valium, a benzodiazepene derivative, "usually 3 times

---

[28] Plaintiff later explained that "[n]ow that I'm taking my other medications, I don't seem to be having such a problem anymore if that's what they referred to."  R. 54.

a day," and Dr. Platt noted "probable benzodiazepine dependence."  R. 381.  *Id.*  On

January 14, 2002, Plaintiff told Dr. Platt that she no longer was abusing prescription

medications.  R. 359.  That representation also appears to be true.  On December 11,

2001, Plaintiff stopped taking OxyContin because it was making her sick and she had

withdrawal symptoms.  R. 225.  On January 4, 2002, Dr. Guskiewicz discharged Plaintiff

from his care for prior overuse of prescription medications.  R. 226, 237-238.   From

December, 2001, until August, 2003, there is no note by a medical doctor finding that

she was abusing prescription medications.  On August 11, 2003,  Dr. Rignanese said

"Unfortunately, . . . it seems like she has fallen back into narcotic dependency and

abuse again," implying that she had been compliant before that, and that this was a

relapse in a period where Plaintiff had not been abusing pain medications.  R. 597.

The ALJ also asked Plaintiff other argumentative leading questions.  For

example, when he asked Plaintiff why she thought she needed to see a psychiatrist, she

said she had problems, explaining that she was bipolar, had ADD, and suffered from

depression.  R. 57.  Rather than asking Plaintiff how these conditions manifested

themselves in her life, the ALJ said: "Well, you told the doctor who treated you for your

neck problems that you were in fairly good health until that display at Target fell on you."

R. 57.  The question made no attempt to distinguish between the occasion for that

statement, when Plaintiff had a severe physical injury and was seeking physical health

treatment, and her mental health at that time.  Further, at the time she made this

statement, in the summer of 2000, she had been in treatment with Dr. Platt since

November 29, 1999, had been diagnosed as having bipolar disorder, and had been

prescribed Lithium and Depakote.

In the same sequence of questions, after finding that Plaintiff saw "this Dr. Platt" "between July of 2000, and the end of 2001" at three week intervals, the ALJ sought to establish that Plaintiff was put on Neurontin and had been doing better.  R. 57.  Plaintiff admitted that Neurontin helped, and said that other things helped, too.  *Id.*  The ALJ's rejoinder to this was:  "So Dr. Platt is just dispensing the medications to you when he sees you.  How long does he talk to you?"  *Id.*  She replied that he saw her for about an hour.  *Id.*  Dr. Platt was dispensing medications.  Indeed, he tried every medication he could think of to help Plaintiff's mental condition.  The record also shows that Dr. Platt talked with Plaintiff about many subjects having a potential bearing upon her mental health.  On this record, it is difficult to see how the ALJ could refer to Dr. Platt's efforts as "just dispensing the medications."

The exchanges discussed above evidence a significant degree of fixation on Plaintiff's abuse of pain medications and a lack of sufficient inquiry into the manifestation of her claimed disabilities notwithstanding her admitted drug abuse. Plaintiff has shown that it would be better to assign this claim on remand to another Administrative Law Judge.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge as to Plaintiff's residual physical functional capacity are supported by substantial evidence in the record and should be affirmed.  However, his findings as to Plaintiff's mental functional capacity are not based upon substantial evidence in the record, and a remand is required to gather more evidence from treating sources.  In particular, Dr. Platt or Plaintiff's current treating mental health source should be asked to render an

opinion as to Plaintiff's residual mental health capacity for the time preceding December 31, 2001, excluding for the effects of misuse of prescription medications, and also to render an opinion as to Plaintiff's residual mental health capacity since January, 2004, when the medications for attention deficit hyperactivity disorder began, again excluding for the effects of any misuse of prescription medications.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the case be **REMANDED** for additional evidence consistent with this report and recommendation.

**IN CHAMBERS** at Tallahassee, Florida, on September 25, 2006.


<u>s/    William C. Sherrill, Jr.</u>
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**